## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRANDON SZALABAWKA, a minor,   )
*et al.,*   )
   )
       Plaintiffs,   )   Case No.  1:09-cv-88-SJM
   v.   )
   )
OFFICER JAMIE RUSSO, *et al.,*   )
   )
       Defendants.   )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.,

Presently pending before the Court in this federal civil rights action is a motion by the Defendants for summary judgment.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  For the reasons set forth below, the motion will be granted in part and denied in part.

## I.      BACKGROUND

At approximately 1:44 a.m. on the morning of September 26, 2007, the Millcreek Township Police Department received a dispatch concerning a home invasion and shots fired at a west-side Millcreek residence.  The assailants were described as being two black males wearing hats with the word "police" on them and tshirts with the same lettering.  The vehicle in which they fled was described as a white minivan, possibly a Dodge Caravan, heading east toward the City of Erie.  Initially, no vehicle plate information was known.

1

Sergeant Anthony Talarico of the Erie Bureau of Police received the foregoing information and took up pursuit of the vehicle.  The white minivan proceeded through the City of Erie at a high rate of speed, disregarding stop signs and stop lights. Because of the high speed at which the vehicle was traveling, Talarico could not get close enough to read the vehicle plate.  Another unit occupied by Erie police officers William Goozdich and Richard Romanski heard the dispatch and joined the pursuit. Their unit was nearly struck head-on by the minivan as it continued eastward through the City of Erie.

At approximately 1:55 a.m., Sergeant Talarico lost sight of the vehicle near an alleyway between Ash and Wallace Streets.  Prior to losing sight of the vehicle, Talarico was able to determine that the license place started with the letter "G."  This information was given out over the air to other police units that had joined in the pursuit.

At 1:56 a.m., one minute after Talarico had lost sight of the van, Erie police officers Jamie Russo and Gabriel Amory located a white Dodge Caravan with a grey bumper, tinted windows, and a license plate beginning with a "G" in the driveway of 655 East 5th Street.  Unbeknownst to the officers, this address was the residence of Plaintiffs Maria Arenas-Jordan, her step-son Brandon Szalabawka, and her father Jose Arenas, none of whom had had any involvement in the home invasion or ensuing chase.

At the time Officers Russo and Amory spotted the white Dodge Caravan, it was stationary with the engine running and brake lights on and it was deep in the driveway toward the back yard of the residence.  Its sole occupant was Arenas-Jordan (hereinafter, "Maria"), a 22-year old white, Hispanic female who was preparing to leave her house so that she could pick her husband up from work.

2

Before Maria could leave her driveway, Russo and Amory backed up to block the driveway and approached the minivan on foot.  With pistols drawn, they ordered her out of the vehicle and onto the driveway in a prone position.  Corporal Todd McLaughlin[1] arrived on scene, handcuffed Maria, and placed her in his cruiser which was parked up the street.  During this time several other city police officers arrived on scene.  One of them was Sergeant Talarico, who remarked in reference to Maria that she was "the retard driving the van."

Maria contends that, in fact, numerous officers present at the time used profanity and abusive language toward her.  Among other things, she was allegedly called a "fucking retard" and an "idiot" and was told her to get out of the "fucking car" and lay on the "fucking ground."  She claims that, during this time, the officers pointed their firearms at her and that, while being handcuffed, she was told she was going to jail. She informed Corporal McLaughlin that her father, Jose Arenas, owned the house and that she was going to Taco Bell to pick up her husband, David Jordan, who was due to get out of work there at 2:00 a.m..  At no time prior to her confinement in the police car was Maria searched or patted down for weapons, nor was she asked for identification.

While Maria was lying prone on her driveway, Officer Romanski proceeded to the rear of the house and announced over his radio that the door was open.  The rear entrance consisted of a sliding glass door with no locking mechanism.  The outer screen door to this entrance had been removed from its track and was resting against the right-hand glass door panel.  Whether the interior sliding door was in fact open is a matter of dispute.  In any event, however, Officers Romanski and Goozdich entered the residence

---

[1] Corporal McLaughlin has no familial relation to the undersigned.

along with Officers Robert Borland, Michael Brown, Geoffrey Filutze, James Bielak, and Steven DeLuca.  Outside the house, Officers Luke Yates and Melanie Szoszorek, together with Officers Amory and Russo, took up various positions in the front and back yards.

Once inside the house, Officers DeLuca and Brown cleared the basement area while Officer Borland maintained his position at the rear door area.  Officers Goozdich, Bielak, Romanski, and Filutze cleared the second floor.  Goozdich and Bielak also cleared the attic, where they found two small children asleep in a curtained-off portion of the attic.

While clearing the second floor, Officer Romanski entered the bedroom of ten-year old Brandon Szalabawka ("Brandon").  What occurred at this point is also a disputed matter.  According to the Defendants, Officer Romanski entered Brandon's bedroom to determine if any of the assailants were in the room and to determine if Brandon was safe.  He required Brandon to show his hands and inquired if he was "all right" and if there was anyone else in the room.  Romanski claims that he had his pistol at the ready but did not threaten Brandon or anyone else.  According to Brandon, however, he was asleep in his bed when several officers entered the room and one of them ordered him to put his hands in the air.  Brandon contends that one officer, presumably Romanski, had his weapon pointed approximately seven or eight inches from the side of his (Brandon's) face.

During the officers' sweep of the second floor, they also encountered Jose Arenas ("Jose").  Again, the parties dispute the details of this encounter.  Defendants claim that Jose argued with the officers concerning their presence but that he was not

4

subjected to any force and was not detained.  Plaintiffs deny that Jose argued with the officers.  They claim that Jose was awakened by the sound of police officers yelling inside his house and that he came out of his room to ask what was going on.  Jose contends that the police officers refused to give him any information and instead told him to "shut up" and that if he did not "shut up now" then he would "be the one going to jail."  (Arenas Depo. [27-24] at p. 17.)[2]

Following their sweep of the house, Officers Bielak and DeLuca exited the residence.  At 2:13 a.m., they located a white Plymouth Voyager minivan with a black bumper[3] and a license plate beginning with the letter "G" in an alley near the Plaintiffs' residence.  According to Plaintiffs, this was the very same alley between Ash and Wallace where Talarico had reported losing sight of the vehicle.  Inside the van was a police scanner radio, black gloves, and a hat with the word "police" on it.  The van was taken into custody by Millcreek police officers and processed.  According to one Millcreek police report, this minivan was found to have an "overheated smell" and its hood was "hot to the touch."  (See Def.'s Ex. D [27-5] at p. 2.)

In the meantime, various Erie police officers on scene at 655 East 5th Street had independently concluded that the Plaintiffs' Dodge Caravan was not the vehicle involved in the Millcreek incident.  After clearing the Plaintiffs' house and checking the back yard for footprints, Officer Filutze returned to the front of the residence and felt the hood of

---

[2]All citations to the record herein will refer to the official CM/ECF pagination noted at the top of the referenced document rather than to the original pagination appearing internally within the referenced document.

[3]Defendants contend that the bumper of this vehicle was grey, not black.  For present purposes we deem the discrepancy to be immaterial, but we will assume the version of events more favorable to the Plaintiffs.

the Dodge Caravan.  Having determined that the vehicle was not hot and therefore

could not have been the minivan involved in the high-speed chase, he left.

Similarly, Officer Peter Dregalla arrived on scene and, according to his own

account, stayed for no more than about 30 seconds.  He felt the hood of the van and

found it to be cold.  Dregalla therefore remarked to Officer Russo that the Caravan "was

not the van that we were looking for" and left to continue the search.  (Dregalla Depo.

[27-29] at p. 10, 14.)

Officer Szoszorek was also present on scene when another unidentified officer

felt the hood of the van and reported that it was cold.  Upon hearing this information,

Szoszorek left the scene to continue searching for the suspect vehicle.

Corporal McLaughlin also became aware that the hood of the van was cold.

Based on the van's temperature and Maria's explanation that she was on her way to

pick up her husband from work, McLaughlin began to conclude that Maria was not a

suspect, and he attempted to convey this information to Talarico.

According to one report, Talarico also felt the hood of the minivan and

determined that it was not hot.  Given this fact and the fact that he could not smell the

vehicle's brakes, Talarico concluded that the Dodge Caravan was not the minivan he

had been pursuing.  By this time, however, Millcreek police units were on their way to

the scene and Talarico decided that Maria should remain in the custody of the Erie

police pending the Millcreek officers' arrival.

Exactly how long Maria remained detained in McLaughlin's cruiser is a matter

that is disputed by the parties.  Defendants claim she was detained for no more than

seventeen minutes, from 1:56 a.m. until 2:13 a.m., when the Millcreek police units

arrived.  Plaintiffs contend that the length of Maria's detention is uncertain and may have been an hour or more.

Following these events, Plaintiffs filed this complaint pursuant to 42 U.S.C. §1983.  In it, Plaintiffs assert numerous violations of their Fourth Amendment rights. First, it is alleged that Defendants made an unreasonable seizure of Maria Arenas-Jordan by arresting her in the absence of probable cause to believe that she was guilty of a criminal offense.  Second, it is alleged that the Defendants conducted unreasonable searches of the Plaintiffs' house and Maria's purse.  Third, it is alleged that the Defendants subjected all three Plaintiffs to excessive force by pointing loaded firearms at each of them and by handcuffing Maria during the course of their investigation.

Defendants have answered the complaint and have filed the pending motion for summary judgment.  Plaintiffs have responded to the motion and the matter is ripe for adjudication.

## II.    STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment shall be granted when no genuine dispute exists as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law," *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir.2009) (citation omitted), and a factual dispute is "genuine," and thus warrants trial, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49, 252 (1986).  Accordingly, in order for a claim to survive summary judgment, "there must be [significantly probative] evidence

on which the jury could reasonably find for the plaintiff." *Id*.  For purposes of Rule 56, we assume that the non-moving party's allegations are true and we give the non-moving party the benefit of the doubt when those allegations conflict with the moving party's claims.  *Valhal Corp. v. Sullivan Assocs*., 44 F.3d 195, 200 (3d Cir.1995).

## III.   DISCUSSION

Plaintiffs' claims are asserted pursuant to 42 U.S.C. § 1983, which affords a private right as against:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…

This statute does not create substantive rights but instead "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

To prevail under 42 U.S.C. § 1983, a plaintiff must prove that s/he suffered the deprivation of a constitutional or federal rights by a person acting under color of state law.  *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995).  Here, there is no question that the Defendants were acting under color of state law while on duty as city police officers.  The only question is whether, on this record, a reasonable jury could find that a violation of the Plaintiffs' federal constitutional rights occurred and, if so, whether the Defendants are nevertheless entitled to qualified immunity.  In making these determinations, we consider each of the Plaintiffs' § 1983 claims individually.

A.

Plaintiffs' first claim is that Maria's Fourth Amendment rights were violated when she was subjected to a false arrest and, thereby, an unreasonable seizure. "It is well-established that the Fourth Amendment 'prohibits a police officer from arresting a citizen except upon probable cause.'" *Reedy v. Evanson*, 615 F.3d 197, 211 (3d Cir. 2010) (citations omitted). Thus, a Fourth Amendment claim of false arrest will be established if the Plaintiff shows that the arresting officer lacked probable cause to make the arrest. *See Fisher v. Matthews,* -- F. Supp. 2d – 2011 WL 1982920 at *29 (citing *Garcia v. County of Bucks*, 155 F. Supp. 2d 259, 265 (E.D. Pa. 2001)).

As an initial requirement there must, of course, be an arrest. We need not linger on this point, however, because, at least for present purposes, Defendants have conceded that Maria was arrested and the record contains sufficient evidence to support such a finding. It is undisputed that, as the officers approached her van, Maria was ordered out of the van and onto the ground at gunpoint. She claims that she was handcuffed within seconds of being placed on the ground. She states that, while lying prone on her driveway at gunpoint, the following occurred.

> … [the police] were asking me who was in the van with me. And at first I was in shock and I didn't respond. So they asked me a second time … or they asked where is he. And I said, where is who. They asked who is in the van with me. And I said, no one.
>
> And then they just kept asking me where is he. And I told them I didn't know what they were talking about. And they put handcuffs on me and said, well, you're going to jail. And I said for what. And then they walked me to the end of the driveway. And that's when they started questioning me about where I was going and who owned the house.

9

(Arenas-Jordan Depo. [27-23] at pp. 75, 77.)  Following this exchange, Maria was

placed in the back of a police cruiser where she remained, handcuffed, for at least

seventeen minutes.  By one account, she claimed to have been held in this manner for

an hour or more.  If credited, this evidence would suffice to establish that an arrest

occurred and that it happened relatively early on in the course of Maria's detention.

We must therefore consider whether the record would support a finding that

probable cause for the arrest was lacking.  Probable cause exists "when the facts and

circumstances within the arresting officer's knowledge are sufficient in themselves to

warrant a reasonable person to believe that an offence has been or is being committed

by the person being arrested."  *Orsatti v. N.J. State Police*, 71 F.3d 480, 482-83 (3d

Cir.1995).  While this requires more than a mere suspicion, it does not require a level of

evidence as would support a conviction.  *Fisher, supra,* at *31.  Thus, this standard

does not depend on the actual guilt or innocence of the arrestee; rather, it depends

solely on whether the arresting officer had reasonable grounds to believe that the

arrestee had committed the crime. *See Radich v. Goode*, 886 F.2d 1391, 1397 (3d

Cir.1989).  The test is an objective one based on the facts available to the officers "at

the moment of arrest," *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994),

rather than in hindsight.  *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir.2005).

Furthermore, whether the arresting officer acts in good faith or in bad faith in

effectuating the arrest is irrelevant.  *Whren v. United States*, 517 U.S. 806, 813–14

(1998).

Typically, the existence of probable cause in a § 1983 action is a question of fact

for the jury.  *Wilson v. Russo*, 212 F.3d 781, 796 (3d Cir.2000) (*citing Sherwood v.*

10

*Mulvihill*, 113 F.3d 396, 401 (3d Cir.1997)); *Groman v. Township of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995).  In appropriate cases, however, a court may conclude that probable cause did exist as a matter of law if the evidence, viewed most favorably to the plaintiff, reasonably would not support a contrary factual finding.  *See Sherwood*, 113 F.3d at 401.

Defendants contend that, under the totality of factors here – including the close match between the Plaintiffs' van and the white minivan that was the subject of the police chase coupled with the fact that Plaintiffs' van was discovered almost immediately after Talarico reported losing sight of it in the same general vicinity – there was probable cause for the officers to believe that Maria was one of the Millcreek shooters, their driver, or their accomplice.

I do not agree, though, that the facts compel such a finding as a matter of law. As the Plaintiffs point out, the van in question was reported to have been last seen going into an alleyway between Wallace and Ash Streets and was not seen coming out. (In fact, the van actually involved in the Millcreek incident was later found in a grassy area in that very location.)  The dispatch report described the suspects as two black males wearing shirts and hats that said "police" and stated that the driver was a black male; there was no mention whatsoever of a Hispanic female being involved.  While Maria was splayed on the ground at gunpoint and questioned about who was in the van and where "he" went, she denied that anyone else was with her and denied knowing what the police were talking about.  Nothing about her conduct in itself was suspicious. Further, no evidence was observed in the course of initially clearing the van which would have implicated Maria in the west-side home invasion.  Although the vehicle's

11

engine was running, there was no sensory evidence, such as the odor of hot brakes, which would have suggested its recent involvement in a lengthy, high-speed chase. Officer Russo has testified that, during this initial approach and clearing of the van, he felt the hood of the vehicle with his bare hand and found it to be warm.  Based on other evidence of record, a factfinder could infer that the temperature of the vehicle at that point, even as alleged by Russo, was inconsistent with its involvement in a lengthy, high-speed chase.  In addition, despite the fact that the Plaintiffs' van certainly matched the general description of the suspect vehicle (including the initial license place letter "G"), the similarities were no so definitive as to compel the conclusion that the officers had probable cause to believe Maria was involved in the home invasion and ensuing chase.  Based upon all of these factors, a jury could reasonably conclude that probable cause for the arrest was lacking.

Even if probable cause for the arrest existed initially, a jury could reasonably conclude that it subsequently dissipated.  Here, there is no dispute that the officers involved in this investigation eventually came to the conclusion that Maria was an innocent party.  Although the record is somewhat ambiguous on this point, a jury could conclude that Maria was detained by the police, possibly still in handcuffs, for some period of time even after they came to the conclusion that her van was not involved in the Millcreek incident.  In particular, there is evidence to suggest that Corporal McLaughlin and Sergeant Talarico concluded Maria was an innocent party, yet she remained in their custody (apparently at Talarico's direction) pending the arrival of Millcreek police officers.  As the record currently stands, a jury could reasonably conclude that Maria's "arrest" continued even after any probable cause to justify it had

dissipated, which would violate the Fourth Amendment.  *See Rogers v. Powell,* 120

F.3d 446, 453 (3d Cir. 1997) ("Continuing to hold an individual in handcuffs once it has

been determined that there was no lawful basis for the initial seizure is unlawful within

the meaning of the Fourth Amendment.").  Accordingly, genuinely disputed issues of

material fact exist relative to Maria's arrest, making summary judgment inappropriate as

to this particular claim.

As a fallback position, however, Defendants contend that they should be

protected by qualified immunity even if probable cause for the arrest was lacking.  As

our circuit court of appeals has stated:

> "[G]overnment officials performing discretionary functions generally are
> shielded from liability for civil damages insofar as their conduct does not
> violate clearly established statutory or constitutional rights of which a
> reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S.
> 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  The qualified immunity
> standard "gives ample room for mistaken judgments by protecting all but
> the plainly incompetent or those who knowingly violate the law."  *Hunter v.
> Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)
> (internal quotations omitted).  In determining qualified immunity, we first
> ask whether "the facts alleged, viewed in the light most favorable to the
> party asserting the injury, show that the officer's conduct violated a
> constitutional right."  *Curley v. Klem,* 298 F.3d 271, 277 (3d Cir.2002).  If
> so, we then ask whether it "would be clear to a reasonable officer that his
> conduct was unlawful in the situation he confronted."  *Id*. (quoting *Saucier
> v. Katz,* 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001)).

*Gilles v. Davis,* 427 F.3d 197, 203-04 (3d Cir. 2005).

Here, we have found that, if a jury construed the present record in the light most

favorable to the Plaintiffs and giving them the benefit of all reasonable inferences, it

could find that Maria was subjected to an arrest in the absence of probable cause to

believe that she was involved in the Millcreek home invasion and ensuing chase and/or

13

that her arrest continued even after any probable cause dissipated.  Thus, the alleged facts do potentially support the existence of a constitutional violation.  Defendants do not dispute (nor could they) that the general right to be free from arrest without probable cause was well established as of the time of their challenged conduct.  The question thus becomes whether it would be clear to a reasonable officer that this conduct was unlawful in the situation these Defendants confronted.

To that end, Defendants contend that they *reasonably believed* they had probable cause to detain Maria "pending further investigation, for the safety of the officers and for the van driver's own protection."  (Br. in Supp. of Mot. for Summ. Judg. [27] at p. 17.)  But if Maria was detained only for the purpose of maintaining safety and the status quo pending an investigation of her involvement in a crime and a determination whether armed suspects were nearby, then Defendants are really articulating the basis of a *Terry* stop.  *See Terry v. Ohio*, 392 U.S. 1 (1968).  Pursuant to *Terry*, police officers may, without offending the Fourth Amendment, conduct a temporary investigatory stop "when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (discussing *Terry*, 392 U.S. at 30).

Defendants argue that they had to arrest Maria because "[t]he limited scope of a *Terry* stop was not sufficient under the specific circumstances facing the arresting officers."  (Defs.' Reply Br. [33] at p. 2.)  But it has long been established that, "when police officers make an investigative stop, they may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'"  *United States v. Edwards,* 53 F.3d 616, 619 (3d Cir. 1995) *(quoting*

14

*United States v. Hensley*, 469 U.S. 221, 235 (1985)).  It has also long been recognized that such "reasonably necessary" measures may even include, in appropriate situations, a show of deadly force with loaded weapons.  *See Edwards,* 53 F.3d at 619 (recognizing that the vast majority of courts have held that blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not *per se* exceed the bounds of a *Terry* stop).  In determining whether officers have exceeded the lawful bounds of a *Terry* stop, the "touchstone" is "'the reasonableness of the intrusion …, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect.'"  *Baker v. Monroe Twp*., 50 F.3d 1186, 1192 (3d Cir. 1995)).

The implication from this is that the officers on scene did not necessarily need to effectuate a custodial arrest of Maria in order to safely carry out their investigation of minivan or their search for possible nearby suspects.  Yet here, as we have noted, there is evidence to support a finding that Maria was, in fact, arrested prior to anyone investigating her situation.  Assuming the Plaintiffs' version of facts to be true, we conclude that a jury could find that an arrest occurred and that a reasonable police officer would know that probable cause for the arrest was lacking.  A reasonable officer would also know that, absent probable cause to believe that Maria was involved in criminal activity, she could not be arrested simply on the ground of maintaining her safety or keeping her out of the way of an unfolding police investigation.  Because there are factual disputes on this record which preclude a definitive ruling on qualified immunity, including the question whether Maria was told she was "going to jail," summary judgment will be denied relative to Maria's false arrest claim.  *See Monteiro v.*

*City of Elizabeth,* 436 F.3d 397, 405 (3d Cir. 2006) ("when qualified immunity depends on disputed issues of fact, those issues must be determined by a jury").

B.

We next consider Plaintiffs' claim that their Fourth Amendment rights were violated by the officers' illegal entry into the house and by their illegal search of Maria's purse.  The Fourth Amendment to the Constitution of the United States prohibits unreasonable searches and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  A search is *per se* unreasonable, subject to a few limited exceptions, unless it is effectuated with a warrant based on probable cause.  *Katz v. United States*, 389 U.S. 347, 357 (1967). Here, there is no dispute that both of the challenged searches were conducted without the benefit of a search warrant.

1.  <u>The Officers' Search of Maria's Purse</u>

Insofar as the search of Maria's purse is concerned, it does not appear that the parties have directly joined issue.  Defendants have not specifically addressed this claim in their motion for summary judgment and, therefore, we do not perceive that it is seriously being challenged at this procedural juncture.

In any event, however, the record is sufficient to allow the claim to go forward. Jose's deposition testimony establishes that, at some point while Maria was still detained in the police cruiser, one of the officers on scene went into her purse (which was still within the Plaintiffs' minivan) in an attempt to locate her driver's license.  There

is no evidence to suggest that Maria consented to this intrusion; on the contrary, her

father maintains that he objected to the officers going through Maria's purse.  One could

reasonably infer that, at the time the officers searched Maria's purse, the minivan had

been cleared, the scene had been secured by the presence of numerous law

enforcement officers, and none of the Plaintiffs presented any immediate threat to the

officers' safety – in other words, no exigent circumstances existed which prevented the

officers from seeking Maria's consent for the search of her license or perhaps seeking

Maria's permission to have her father retrieve her license.  Accordingly, Maria's Fourth

Amendment claim premised upon the searching of her purse survives Defendants'

motion.

      2.  <u>The Officers' Entry into the House</u>

      We next consider the officers' conduct as it pertains to their search of the

Plaintiffs' residence.  There is no dispute that the Erie police officers entered and

searched the house without the benefit of a search warrant.  However, the Defendants

claim their actions were warranted and legal under either the "protective sweep" or

"exigent circumstances" exceptions to the warrant requirement.

      a)  *Protective Sweep*

      The Fourth Amendment permits a limited protective sweep without a search

warrant incident to an in-home arrest when the officers searching the premises possess

a reasonable belief, based on specific and articulable facts together with rational

inferences from those facts, "that the area to be swept harbors an individual posing a

danger to those on the arrest scene."  *Maryland v. Buie*, 494 U.S. 325, 337 (1990).  This

17

holding has been extended in this circuit to include protective sweeps undertaken when a suspect is arrested just outside of the home.  *Sharrar v. Felsing,* 128 F.3d 810, 824 (3d Cir. 1997).  As Defendants point out, the validity of the protective sweep does not depend on the lawfulness of the arrest or the dangerousness of the arrestee.  *Sharrar,* 128 F.3d at 823.

Citing this legal principle, Defendants contend that their protective sweep of the Plaintiffs' residence was justified based on their reasonable (albeit mistaken) belief that at least two individuals involved in the Millcreek incident had gone into the house with weapons after fleeing their vehicle.  Defendants insist that this situation posed an immediate threat to the safety of the police officers on scene and to the residents inside the home.

The problem with Defendants' theory is that it depends on disputed facts which, depending on their resolution, potentially made it unreasonable for the officers to believe that armed suspects had entered the house.  It is clear enough that, at the time the officers proceeded to the back yard of the residence, the outer screen door to the rear entrance was found to be off of its track and was leaning against the right-hand side of the sliding glass door frame.  Various Defendants have testified that the interior sliding glass door was ajar at the time, prompting Officer Romanski to report an "open door" to his fellow officers.  However, Plaintiffs have presented evidence that the interior sliding glass door had been closed by Maria as she exited the house to go pick up her husband and that it had also been secured by a wooden board which required an

individual to use considerable force in order to open it from the outside.[4]   Should a jury credit the Plaintiffs' evidence, it could find that the officers who entered the back yard observed only a screen door off its track and an interior door that was closed and sufficiently secured so as to prevent ready access to intruders.   If it so found, a jury could then also infer that the officers lacked a reasonable basis to believe that armed and dangerous individuals were inside the house.

Defendants have suggested that, even if the door was actually shut, other officers rushing into the house after hearing Romanski's mistaken radio report about the open door would have been justified in concluding that armed and dangerous individuals were inside Plaintiffs' home.   However, the record is ambiguous concerning the order in which certain officers arrived to the back yard area and whether they entered the house individually in reliance on Romanski's report or as a group.   At oral argument, defense counsel suggested that the officers made a collective decision to go into the house together after rallying in the back yard and determining that they had a sufficient number of officers present to safety carry out the sweep.   Should the evidence bear this out, a jury might infer that all of the officers who entered the home were in a position to know that the sliding glass door was in fact closed, not open, and that no reasonable basis existed to believe intruders were inside the house.

Finally, there is evidence showing that Officer Goozdich, prior to the officers' entry into the home, had notified his fellow officers that this was the home of Carlos

---

[4] The testimony of the Defendants varies in terms of how far the sliding door was open.  By Romanski's account, the door was ajar one inch or less, while other police officers reported the door as being wide open.  Regardless, for purposes of adjudicating this summary judgment motion, we must accept the version of events most favorable to the Plaintiffs, and we will therefore assume that the door was fully closed.

Arenas and Jose Arenas Jr. (Maria's two brothers) and that the two men were "wanted." The record further suggests that Erie police officers had been to the Plaintiffs' home on prior occasions looking for Carlos and Jose Jr. who, incidentally, were no longer living at 655 East 5th Street at the time of the events giving rise to this litigation.  Plaintiffs theorize that the alleged protective sweep of their home was merely a pretext for a warrantless entry, the true purpose of which was to allow the officers to arrest Carlos and Jose Jr.

In sum, genuinely disputed issues of material fact exists on this record which could support a finding that the officers lacked reasonable grounds to believe that dangerous intruders had entered the Plaintiffs' home.  Summary judgment is therefore inappropriate as to this claim.

### b)  Exigent Circumstances

Defendants also contend that their entry into the Plaintiff's house was justified under the "exigent circumstances" exception to the warrant requirement.  This doctrine holds that police officers may conduct a warrantless search of a home where there is probable cause to support the search and some exigency exists which excuses the need for a warrant.  *See generally Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006); *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996).  Exigent circumstances may exist, e.g., where "officers reasonably … believe that someone is in imminent danger," *Couden,* 446 F.3d at 496 (citing *Parkhurst,* 77 F.3d at 711), or where a warrantless entry is made necessary by "hot pursuit of a fleeing felon," the "imminent destruction of evidence," or "the need to prevent a suspect's escape."  *Couden, supra,* at 496 (quoting *Minnesota v. Olson*, 495 U.S. 91, 100 (1990)).  "A court makes the determination of

20

whether there were exigent circumstances by reviewing the facts and reasonably discoverable information available to the officers at the time they took their actions and in making this determination considers the totality of the circumstances facing them." *Estate of Smith v. Marasco,* 318 F.3d 497, 518 (3d Cir. 2003).

Defendants contend that their entry into Plaintiffs' home was justified by their reasonable belief that they were pursuing armed suspects who were attempting to flee after engaging in serious criminal conduct and a high-speed vehicular chase. They claim that they entered the residence in order to prevent possible imminent danger to the inhabitants and to other officers.

As with the Defendants' protective sweep theory, however, this argument depends on certain material facts which are disputed on this record, making summary judgment inappropriate. For the reasons previously discussed, a fact-finder accepting the version of events most favorable to the Plaintiffs could conclude that the officers made a collective decision to enter the house lacking any reasonable basis to believe that the suspects from the Millcreek home invasion had fled there. A jury could further conclude that the residential search, though limited in scope, was unsupported by probable cause.

Should the jury reach these factual conclusions, the Defendants would not be entitled to protection on qualified immunity grounds, since it would be clear to a reasonable officer that a warrantless entry under such circumstances would violate the Fourth Amendment. Accordingly, qualified immunity cannot be granted at this time, as it depends upon the resolution of genuinely disputed issues of fact. *Monteiro,* 436 F.3d at

405.  Summary judgment will therefore be denied as to the Plaintiffs' Fourth

Amendment claim premised upon the allegedly illegal search of their residence.

C.

We next consider Plaintiffs' claims that their Fourth Amendment rights were

violated by virtue of the officers' use of excessive force against them.  Any excessive

force claim in the context of this case must be based on the Fourth Amendment's

protection against unreasonable seizures of the person.  *See Groman v. Township of*

*Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Graham v. Connor*, 490 U.S. 386,

394–95 (1989)).

The Supreme Court has stated that the "use of force is contrary to the Fourth

Amendment if it is excessive under objective standards of reasonableness."  *Saucier v.*

*Katz,* 533 U.S. 194, 202 (2001), *overruled in non-relevant part by Pearson v. Callahan,*

555 U.S. 223 (2009).  In making this determination, we must evaluate the

reasonableness of "a particular use of force ... from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight," while recognizing

"that police officers are often forced to make split-second judgments -- in circumstances

that are tense, uncertain, and rapidly evolving -- about the amount of force that is

necessary."  *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

The Supreme Court has admonished that courts should consider "the facts and

circumstances of each particular case, including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others,

and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*. at

396.  Our court of appeals has included additional factors for consideration, such as "the

22

duration of the action, whether the action takes place in the context of effecting an

arrest, the possibility that the suspect may be armed, and the number of persons with

whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810,

822 (3d Cir.1997).

    1.  <u>The Officers' Use of Force Against Maria</u>

       Plaintiffs contend that Maria was unlawfully subjected to excessive force when

she was ordered to the ground at gunpoint and handcuffed.  Although Maria has alleged

that approximately 4 to 5 officers were involved in this conduct, it chiefly implicates the

actions of Officers Avory and Russo, along with Corporal McLaughlin.

       Having reviewed this record in the light most favorable to the Plaintiffs, I do not

agree that the officers' conduct in ordering Maria to the ground at gunpoint and

handcuffing her gives rise to a viable excessive force claim, considering the relevant

factors outlined above.  As Officers Avory and Russo made their initial approach toward

the Plaintiffs' minivan, they knew, based on the similarities between the Plaintiffs'

vehicle and the description given out over the police radio, that there was a clear

possibility the occupant(s) might have been involved in the Millcreek home invasion as

well as the ensuing high speech chase.  The crimes were obviously very serious and

the officers had every reason to believe that the suspects involved in the Millcreek

incident were armed and dangerous individuals who would pose a threat to others and

who would attempt to evade (and had already attempted to evade) arrest.  Based on the

dispatch reports, there was also a chance that at least two men would be in the minivan

and possibly others as well.  Unquestionably, the events giving rise to this lawsuit

played out very swiftly such that Officers Avory and Russo had virtually no time to

reflect upon the their possible courses of action.  In light of these undisputed facts, I

conclude, as a matter of law, that the officers did not employ excessive force in ordering

Maria out of the van at gunpoint and placing her in handcuffs.[5]

I draw this conclusion notwithstanding the fact that there exists on this record a

genuine issue of material fact as to whether Maria was arrested without probable cause.

Should a jury find that Maria was in fact placed under arrest and that probable cause for

the arrest was lacking, this would not necessarily mean that the officers' show of deadly

force in initially detaining her, or their use of handcuffs, was *per se* constitutionally

excessive.  On the contrary, our court of appeals has rejected the notion that a lack of

probable cause in making an arrest in itself establishes that the force used in making

the arrest was excessive.  *See Snell v. City of York,* 564 F.3d 659, 672 (3d Cir. 2009)

(rejecting the plaintiff's argument "that the force applied was excessive solely because

probable cause was lacking for his arrest"); *Robinson v. Fetterman*, 378 F.Supp.2d 534,

544 (E.D.Pa.2005) (*citing Bodine v. Warwick*, 72 F.3d 393, 400 & n. 10 (3d Cir.1995))

(rejecting conflation of claims for false arrest and excessive force, noting that "merely

because a person has been falsely arrested does not mean that excessive force has

been used.").  That is because claims of excessive force and false arrest implicate

different aspects of the Fourth Amendment's "reasonableness" requirement:  the

probable cause requirement concerns the justification for a seizure while the

proscription against excessive force concerns the manner in which the seizure is carried

out.  *See Halpin v. City of Camden,* Civil No. 05-2088 (RMB), 2007 WL 1521435 at *6

---

[5] Similarly, even if other officers on scene at the time were involved in this same conduct, I find that there can be no viable excessive force claim against them.

(D.N.J. May 21, 2007) ("The Fourth Amendment right to be free from unreasonable seizures is violated by either an unlawful arrest or the use of excessive force.  Neither is a right in itself but rather they are two forms that a violation of the right may take.  An unreasonable seizure that takes one form -- an unlawful arrest -- is not also an unreasonable seizure of another form-the use of excessive force.  Accordingly, Plaintiff cannot state a claim of excessive force based on the mere fact that she was arrested without probable cause.").

Moreover, to the extent the Plaintiffs' excessive force claim is premised upon the officers' *continued* act of handcuffing Maria even after it became clear that she was merely an innocent bystander, this claim, too, must fail.  To begin, it is not clear that the mere act of handcuffing a suspect or an arrestee can constitute excessive force, absent an allegation that the handcuffs were applied too tightly.  In fact, there is some case law suggesting otherwise.  See, e.g., *Jefferson v. Township of Medford*, civil Action No. 08-cv-6269 (NLH) (KMW), 2010 WL 5253296 at *11 (D.N.J.  Dec. 16, 2010) (dismissing excessive force claim against police sergeant where sergeant's only contact with suspect was to assist in handcuffing her, and no evidence showed that his actions alone constituted excessive force or would otherwise strip him of qualified immunity); *Halpin, supra*, at *6 (rejecting the plaintiff's claim that her "mere arrest itself with the use of handcuffs alone was excessive force" where no crime had been committed).

However, even if the act of keeping Maria in handcuffs could, by itself, constitute excessive force, this Court would enter summary judgment in favor of the Defendants on the basis of qualified immunity.  In my view, reasonable officers faced with the situation that presented itself here would not necessarily understand that the act of

requiring Maria to remain handcuffed temporarily in the back of a police cruiser pending the arrival of Millcreek police units would amount to an unconstitutional application of force, even if they should have known that it might constitute a continued arrest without probable cause.  Accordingly, Defendants motion for summary judgment will be granted with respect to Plaintiffs' claim of excessive force insofar as that claim is premised upon the officers' treatment of Maria.

2.  Officer Romanski's Use of Force Against Brandon

Plaintiffs also contend that Brandon was subjected to excessive force in violation of the Fourth Amendment when Officer Romanski pointed his loaded handgun at Brandon in the course of clearing Brandon's bedroom.  If the record is construed in the light most favorable to the Plaintiffs, there is evidence from which a jury could find that Romanski entered Brandon's lighted bedroom after being advised by Jose that a ten year-old boy was in there and then ordered Brandon to place his hands in the air while pointing his loaded firearm approximately seven or eight inches from the boy's head.  If credited by the jury, this evidence would support a finding that Romanski's use of force against Brandon was excessive.  Furthermore, no reasonable officer acting in the manner alleged by the Plaintiffs could believe that his use of force was constitutionally permissible.

Furthermore, Brandon has alleged that Romanski was not the only officer who entered his room.  Generally, police officers have a duty to intervene where possible in order to prevent the use of excessive force, and this right was well established in this circuit prior to September 26, 2007.  *See Garbacik v. Janson*, 111 Fed. Appx. 91, 94 (3d Cir. 2004) (finding that duty to intervene on part of nonsupervisory police officers was

clearly established as of 1997 and thus, trooper who failed to intervene to prevent fellow officer's use of excessive force was not entitled to qualified immunity).  Because the record as it presently stands gives rise to a material ambiguity and conflicting accounts involving genuinely disputed facts, we cannot resolve this claim on summary judgment. Defendants' motion will therefore be denied insofar as it pertains to Plaintiffs' claim of excessive force relative to the officers' treatment of Brandon.

   3.   The Officers' Use of Force Against Jose

   We next consider Plaintiffs' claim that Jose was subjected to excessive force when officers pointed their loaded guns at him and restricted his freedom of movement with the use of threats.  (Complaint [27-2] at ¶¶ 38-39.)  Upon careful review of the record, the Court finds these allegations to be unsupported.

   First, the evidence does not support a conclusion that Jose was "seized" within the meaning of the Fourth Amendment.  *See Abraham v. Raso,* 183 F.3d 279, 288 (3d Cir. 1999) ("To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable.").  A "seizure" occurs for Fourth Amendment purposes when a government official has, "by means of physical force or show of authority, ... in some way restrained [the person's] liberty."  *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968).  *See also Berg v. County of Allegheny,* 219 F.3d 261, 269 (3d Cir. 2000) (per curiam) ("A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his freedom of movement.").  Here, there is no evidence that Jose's freedom of movement was substantially restricted.  In fact, the

evidence suggests that Jose moved about freely both inside the house and outside as the police investigation unfolded.

Even if a Fourth Amendment seizure did occur with respect to Jose, however, the evidence does not demonstrate any use of force against him that could be considered constitutionally excessive.  At most, the record supports a finding that Jose was told to "shut up" and was threatened with the possibility of arrest if he did not calm down and stop asking questions.  Contrary to the allegations in the complaint, there is no contention by Jose in his deposition that officers pointed their weapons at him. Consequently, the evidence does not support a viable claim of excessive force as against Jose.  *See, e.g., Rogers v. Essex County,* 2011 WL 2144428 at*2 (3d Cir. June 1, 2011) (court concluding that it could not reasonably infer that excessive force was used based on plaintiff's allegation that the defendants verbally abused him and placed him in jail); *Shuey v. Schwab,* 2010 WL 479938 at *4 (M.D. Pa. Feb. 4, 2010) (alleged threats to arrest plaintiff, standing alone, could not support a claim of excessive force); *Page v. Forry,* 2009 WL 3109828 at *2 (D. Del. Sept. 29, 2009) (verbal abuse and harassment did not rise to the level of a constitutional violation).  Summary judgment will therefore be granted in favor of the Defendants with respect to this particular claim.

### D.

Finally, we note that liability under § 1983 requires the personal involvement of the defendant in the alleged wrongdoing.  This may be shown by demonstrating that a defendant participated in violating the plaintiffs rights, or that he directed others to violate them, or that he, as the officer in charge, had knowledge of and acquiesced in his subordinates' violations.  *See Baker v. Monroe Twp*., 50 F.3d 1186, 1190-91 (3d Cir.

1995); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir.1990); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988).

On this record there is no evidence to suggest the personal involvement of Defendants Yates, Szoszorek, or Dregalla in any of the constitutional violations alleged by the Plaintiffs.  As to these three Defendants, Plaintiffs agree that their personal involvement in the alleged wrongdoing cannot be shown.  Accordingly, they will be terminated from this action and judgment will be entered in their favor.

As to the remaining Defendants, however, the record is still somewhat ambiguous as to their respective involvement in the alleged Fourth Amendment violations that underlie the Plaintiffs' remaining §1983 claims.  What we can say at this point is that there appears to be no basis for holding Officer Amory, Officer Russo, or Corporal McLaughlin liable for any of the alleged misconduct that occurred within the Plaintiffs' residence.  Accordingly, they will be afforded summary judgment in this limited respect.  As to the remaining Defendants and the remaining §1983 claims, the personal liability, or lack of personal liability, of each named officer will have to be further distilled at time of trial.

## IV.   CONCLUSION

Based upon the foregoing discussion, the Defendants' motion for summary judgment will be granted in part and denied in part.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

BRANDON SZALABAWKA, a minor,  )
*et al.,*                      )
                              )
        Plaintiffs,   )    Case No.  1:09-cv-88-SJM
    v.                 )
                              )
OFFICER JAMIE RUSSO, *et al.,*  )
                              )
        Defendants.   )

**ORDER OF JUDGMENT**

AND NOW, *to wit,* this 28th day of September, 2011, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment [25] shall be, and hereby is, GRANTED in part and DENIED in part as follows:

1. Said motion is GRANTED insofar as it relates to Plaintiffs' claim that Maria Arenas-Jordan was subjected to excessive force in violation of her Fourth Amendment rights.  As to this particular claim, JUDGMENT shall be, and hereby is, entered in favor of the Defendants and against Plaintiff Maria Arenas-Jordan;

2. Said motion is GRANTED insofar as it relates to Plaintiffs' claim that Jose Arenas was subjected to excessive force in violation of his Fourth Amendment rights.  As to this particular claim, JUDGMENT shall be, and hereby is, entered in favor of the Defendants and against Plaintiff Jose Arenas;

3.  Said motion is GRANTED insofar as it relates to any and all claims directed against Officers Melanie Szoszorek, Luke Yates, and Peter Dregalla.  As to such claims, JUDGMENT shall be, and hereby is, entered in favor of Defendants Szoszorek, Yates, and Dregalla and against Plaintiffs; and

4.  Said motion is DENIED in all other respects.


Signed/        Sean J. McLaughlin

                Sean J. McLaughlin
                United States District Judge


cm:    All counsel of record.